# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT
_____

No. 06-1962/2412
_____

| | | |
|---|---|---|
| Otter Tail Power Company, | * | |
| | * | |
| Petitioner, | * | |
| | * | |
| | * | Petitions for Review of a |
| v. | * | Decision of the |
| | * | Surface Transportation Board. |
| Surface Transportation Board; | * | |
| United States of America, | * | |
| | * | |
| Respondents, | * | |
| | * | |
| BNSF Railway Company, | * | |
| | * | |
| Intervenor on Appeal. | * | |
| | * | |
| _____ | * | |
| | * | |
| Edison Electric Institute; American | * | |
| Public Power Association; National | * | |
| Rural Electric Cooperative Association; | * | |
| National Association of Regulatory | * | |
| Utility Commissioners; Minnesota | * | |
| Public Utilities Commission; Montana | * | |
| Public Service Commission; North | * | |
| Carolina Utilities Commission; North | * | |
| Dakota Public Service Commission; | * | |
| South Dakota Public Utilities | * | |
| Commission, | * | |
| | * | |
| Amici on Behalf of | * | |
| Petitioner. | * | |

_____

Before MURPHY and SMITH, Circuit Judges, and READE,[1] District Judge.
_____

SMITH, Circuit Judge.

Otter Tail Power Company ("Otter Tail") challenges the determination of the Surface Transportation Board ("the Board") that rates proposed by Burlington Northern Santa Fe Railway (BNSF) were reasonable. We affirm.

## I. *Background*

Otter Tail ships coal from its mining facility in Wyoming to South Dakota via BNSF. Otter Tail has no railroad transportation alternative to BNSF and is thus considered a captive shipper. Under federal law, railroad companies, or carriers, are required to charge captive shippers, such as Otter Tail, a reasonable rate. 49 U.S.C. § 10701(a). If a shipper believes the rate charged by the carrier is unreasonable, then the shipper can challenge the rate before the Board. Congress vested the Board with the authority to promulgate rules for determining a reasonable rate. *Id*. § 10707(d)(1). Congress also vested the Board with the authority to impose a rate upon a carrier if the proposed rate is deemed unreasonable. *Id*. § 10704(a)(1). Here, BNSF proposed a rate of $13.49 per ton to Otter Tail for shipping its coal. Otter Tail considered the rate unreasonable and sought relief from the Board.

The Board applies economic models to analyze the reasonableness of a carrier's proposed rate. The principles behind the economic models employed are set forth in the Board's Coal Rate Guidelines ("the Guidelines") promulgated by the Board in

---

[1]The Honorable Linda R. Reade, Chief Judge, United States District Court for the Northern District of Iowa, sitting by designation.

1985. *Id.* § 10701(d)(3). The Guidelines are based upon the theory of Constrained Market Pricing (CMP), which, in short, is designed to prevent monopolistic behavior by carriers. The Guidelines identify potential monopolistic pricing through an analytical device called a Stand-Alone-Cost test ("SAC test"). Under the SAC test, a shipper and carrier each hypothesize what rate might be charged if the carrier participated in a competitive rail market. *Coal Rate Guidelines, Nationwide*, 1 I.C.C.2d 520, 540–545. "In this way, railroads functioning in a noncompetitive market will be required to price as if alternatives to their services were available." *Id.* at 541. If the rate charged by the actual carrier is greater than the rate charged by a fictional competitor, then the Board will presume the proposed rate is unreasonable. The hypothetical rail competitor designed by the parties is known as a Stand-Alone Railroad (SARR). *Id.* at 543.

In its consideration of BNSF's proposed rate, the Board required Otter Tail and BNSF to each develop a SARR that included the possibility of a prohibited cross-subsidization in their SARR analysis. Cross-subsidization occurs when the price a shipper pays to the carrier includes costs for the maintenance of a rail route the shipper does not use. *Id.* at 521. A "[c]aptive shipper should not bear the costs of any facilities or services from which it derives no benefit." *Id.* Of particular note in this case, the Board instructed the parties to determine whether a cross-subsidy existed by applying what is now known as the *PPL*-test—the test first announced in *PPL Montana, LLC v. The Burlington Northern and Santa Fe Ry. Co.*, 6 S.T.B. 286 (2002).

Otter Tail's SARR consisted of a single 1,208-mile route stretching from Converse, Wyoming, to Big Stone, South Dakota. However, the SARR adopted by the Board assumed the existence of two smaller railways: (1) a 100-mile, high-density, profitable north-south segment and (2) a 1,108 mile low-density, less-profitable east-west segment. The 100-mile route runs from Campbell, Wyoming, to Converse, Wyoming. After applying the *PPL* cross-subsidy test to its preferred model, the Board

determined that carriers on the popular and prosperous 100-mile, high-density route were subsidizing carriers on the less-profitable 1,108-mile, low-density route.

BNSF proposed a rate of $13.49/ton for Otter Tail's coal shipments. Otter Tail ships roughly two-million tons of coal a year and wisely seeks to keep its shipping costs low. Otter Tail challenged BNSF's proposed rate, contending that the one-railway SARR was more appropriate and would produce a more favorable shipping rate of $11.99/ton. Employing the Board's preferred two-rail SARR, a shipping rate as high as $29.97/ton could be found reasonable. The Board found BNSF's proposed $13.49/ton rate to be reasonable. Otter Tail appeals.

## II. *Discussion*
### A. *PPL-test*

On appeal, Otter Tail principally argues that the Board violated the Guidelines by adopting and applying the *PPL*-test rather than the SAC-test it previously used. Otter Tail requests that we hold that the Board's decision was arbitrary and capricious. In response, the Board first argues that Otter Tail's failure to properly present these issues in the administrative proceedings precludes us from a review of its determination. After reviewing the record, we agree with the Board and decline to review its use of the *PPL*-test.

Courts apply a judicially imposed issue-exhaustion requirement when reviewing administrative decisions, which is "analog[ous] to the rule that appellate courts will not consider arguments not raised before trial courts." *Sims v. Apfel*, 530 U.S. 103, 108–109 (2000).

Neither the Supreme Court nor this court has articulated with precision the requirements an appellant must fulfill to successfully claim that it has properly raised and exhausted an issue before the Board. However, the Court has articulated a standard of specificity that arguments submitted to an administrative agency such as

the Board must meet to obtain judicial review. An argument must be more than a "cryptic and obscure reference to matters that 'ought to be' considered." *Vermont Yankee Nuclear Power Corp. v. Natural Resources Defense Council, Inc.*, 435 U.S. 519, 553–554 (1978). Instead such arguments must be forthright and "forcefully presented." *Id.*; *See also Appalachian Power Co. v. E.P.A.*, 251 F.3d 1026, 1036 (D.C. Cir. 2001) ("Generalized objections to agency action or objections raised at the wrong time or in the wrong docket will not do.")

We note that the joint appendix submitted by the parties consists of over 300 pages of motions, exhibits, and other relevant material excluding Otter Tail's final brief. Out of these 300 pages, Otter Tail can only point to twenty-one words spread over two sentences found in two different proceedings where it referenced the Board's adoption of the *PPL*-test. In the first reference, Otter Tail states, "Otter Tail is uncertain why the Board has posed the cross-subsidy question . . ." The second citation by Otter Tail states "Otter Tail . . . continues to object to the *PPL*-test . . . "

These two statements provide an insufficient record that the principal issue raised on appeal was adequately raised to the administrative body below. These statements could not have put BNSF and the Board on notice that Otter Tail planned to challenge the adoption of the *PPL*-test. These two generalized and undeveloped statements are not structured in a way that " alerts the agency to the [parties'] position and contentions in order to allow the agency to give the issue meaningful consideration." *Dep't of Transp. v. Public Citizen*, 541 U.S. 752, 764 (2004).

Otter Tail correctly notes that it first officially raised a challenge to the use of the *PPL*-test in its final brief. We agree that this challenge was sufficient to put the Board and BNSF on notice of its objection to the *PPL*-test. However, this notice was fatally late. The parties submitted final briefs simultaneously. Therefore, BNSF had no opportunity to investigate or respond to the *PPL*-test challenge nor did the Board have the opportunity to receive evidence relating to Otter Tail's challenge. We believe

that under such circumstances our review would violate the exhaustion rule's principle of "[s]imple fairness to those who are engaged in the tasks of administration, and to litigants . . ." *United States v. L. A. Tucker Truck Lines, Inc.*, 344 U.S. 33, 37 (1952). We therefore decline to review Otter Tail's challenge to the *PPL*-test.

Otter Tail argues that even if it failed to properly challenge the *PPL*-test, then we should apply a narrow exception carved out by the Ninth Circuit in *Great Falls Community TV Cable Co. v. F. C. C.*, 416 F.2d 238, 239–240 (9th Cir. 1969). This exception exempts litigants from exhaustion when an agency has repeatedly and consistently decided the issue being appealed. Assuming, without deciding, that such a rule should be adopted, we believe the narrow exception is not applicable here. The *PPL* decision is relatively recent and does not have the type of subsequent reiterative decisions contemplated by *Great Falls*. Throughout its argument, Otter Tail attempts to distinguish the instant case from *PPL Montana, LLC v. STB*, 437 F.3d 1240 (D.C. Cir. 2006)—the sole appellate decision addressing the validity of the *PPL*-test. Otter Tail on the one hand argues that the *PPL* is invalid and imprudently adopted and on the other hand contends that the use of the test is so settled it need not be raised before the Board. This inconsistency renders the argument untenable.

We hold that Otter Tail has waived its challenge to the *PPL*-test. Otter Tail points to other record examples to substantiate its claim that it timely raised objections to the Board's application of the test. Specifically, Otter Tail mentions the calculation and allocation of various costs. However, we believe that those arguments also lack the required forceful presentation necessary to give BNSF and the Board adequate notice.

## B. *Exclusion of Evidence*
"An administrative agency enjoys broad discretion in carrying out the mandates of its governing statutes and we will set aside an agency's action only upon a showing that the action is arbitrary, capricious, an abuse of discretion, or otherwise not in

accordance with law." *Mausolf v. Babbitt*, 125 F.3d 661, 667 (8th Cir. 1997) (internal citations and quotations omitted). "Procedural issues . . . lie largely within the discretion of the agency."*City of St. Louis v. Dep't of Transp.*, 936 F.2d 1528, 1538 (8th Cir. 1991).

Otter Tail submitted a SARR based upon certain debt-related calculations. BNSF accepted this calculation as true. Despite the lack of an objection by BNSF, Otter Tail entered a new calculation in its reply. The Board refused to admit into evidence this new debt-related calculation, pursuant to its long-held rule limiting rebuttal statements to issues raised in the reply statements by the opposing party.

Otter Tail argued that the new information was not a rebuttal statement, but merely an update of its earlier calculation based upon newly-discovered information which could not have been determined earlier. The Board rejected this argument after reviewing the data, determining Otter Tail was attempting to change the entire methodology used to make the relevant calculation. Because the Board's conclusion is supported by record evidence, we cannot say that it abused its discretion in refusing to admit the revised debt-related calculation.

## III. *Conclusion*

For the forgoing reasons, the petition for review is denied.

_____